Elizabeth D. Tate AZ Bar No. 032659
Elizabeth D. Tate Attorney at Law
2953 N. 48th Street
Phoenix, AZ 85016
Telephone (602) 670-4653
Fax (480) 935-3746
attorneyelizabethtate@yahoo.com
Attorney for  Plaintiff Sean and Heather Jackson

## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sean Jackson, | ) Case No.: 2:22cv01863 |
| | ) |
| and | ) **SECOND AMENDED COMPLAINT** |
| | ) |
| Heather Jackson, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Pinal County, | ) |
| Pinal County Sheriff, Mark Lamb, in his | ) |
| official and individual capacities, | ) |
| and | |
| State of Arizona, | |
| Defendants. | |

COMES NOW, Plaintiffs Sean Jackson and Heather Jackson, by and

through their  attorney of record, Elizabeth Tate, and hereby submit their Second

Amended Complaint against Defendants, and each of them, and alleges as follows:

///

///

///

## PRELIMINARY STATEMENT

**1.**      Plaintiffs are a married deaf couple  who repeatedly experienced discrimination based on disability when receiving services from Pinal County, Pinal County Sheriff, Mark Lamb and the Department of Children and Family Services.

**2.**      Plaintiffs stood accused of child abuse and neglect. Defendants repeatedly denied Plaintiffs effective communication during their arrests, incarcerations, and the removal of their minor children from their home. The law ensured  effective communication with  Plaintiffs because of their disabilities. Defendants repeatedly denied Plaintiffs effective communication by  denying Plaintiffs' requests for qualified American Sign Language "ASL" interpreters through their prosecution through the government systems.

**3.**      Due to Defendants' refusal to provide effective communication, Plaintiffs did not meaningfully understand their arrests and the removal of their minor children from their home in violation of their rights as citizens under arrest. as pretrial detainees and  as a  family in need of services. Plaintiffs were forced to sign waivers of their rights and denied a full

explanation of their rights as citizens undergoing the services and programs offered by Defendants.

4.      Defendants were on notice that Plaintiffs are deaf, having been informed by Plaintiffs' adult son, Dashiel Jackson.  Defendants' communication with Plaintiffs was not effective. Plaintiffs and Dashiel Jackson,  at various times, requested sign language interpreters. Rather than provide the interpreters, Defendants knowingly limited Plaintiffs to the little communication they could achieve through Mrs. Jackson's little ability to read lips and both Plaintiffs' gestures and handwritten notes.

5.      The  Defendants' refusal to offer qualified on-site language interpreter services was the result of  a policy or practice of Defendants  to discourage the use of qualified sign language interpreter services to each Plaintiff without regard to whether the Plaintiffs understood the nature of their services and possessed an  understanding of the legal system to which Defendants subjected Plaintiffs.

6.      Lip reading, the ability to understand the speech of another by watching the speakers lips is an extremely speculative manner of communication and simple written notes is an extremely speculative manner of explaining Plaintiffs' rights  during their criminal  prosecutions and removal of their children  from their care under the legal system.

7.      Defendants have demonstrated and continue to demonstrate that Defendants' staff is not properly trained on how to communicate effectively

with deaf individuals facing the criminal justice system, removal of their

children  and serving  jail time. As a result of the lack of communication,

Plaintiffs were subjected to  greater indignities than the hearing public

including loss of their rights, inhuman conditions at jail and loss of their

property.

**8.**      Defendants repeated denial of effective communication during

Plaintiffs' arrest and criminal prosecution and jail stays  caused Plaintiffs to

suffer significant pain, suffering and emotional distress caused by

ineffective communication.

## NATURE OF THE ACTION

9.      Plaintiffs bring this lawsuit to compel Defendants to cease unlawful

discriminatory practices to implement policies and procedures that will

ensure effective communication, full and equal protection to the deaf to

participate and benefit from the criminal justice system and family

protection system.

10.      Plaintiffs seek declaratory, injunctive, and equitable relief,

compensatory damages, and attorney's fees to redress Defendants unlawful

discrimination on the basis of disability in violation of Title II of the

Americans with Disabilities Act "ADA", 42 U.S.C. § 12132 et seq.  and

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791. Mrs.

Jackson also seeks legal redress under 42 U.S.C. § 1983.

## PARTIES, JURISDICTION AND VENUE

1.      At all times relevant hereto to this action, Plaintiffs, Sean Jackson, and

Heather Jackson were married and living together. Mr. and Mrs. Jackson

have a total of eight natural children born as a result of their union.  Six of

the Jackson's children are under the age of ten and lived with The Jacksons

at the time of their arrest. Two of the Jackson children are adults living on

their own.  The Jackson  children are not deaf and have the ability to

understand and communicate with their parents in  ASL.

2.      Always relevant hereto this action, Defendant, Pinal County  is a

governmental entity  that operates a sheriff's department for the purpose of

serving and protecting the public and the  Pinal  County Detention Center to

detain citizens involved in the criminal justice system. Pinal County employs

over 500 employees, 220 of which are law enforcement.

3.      Always relevant hereto this action, Defendant, Pinal County Sheriff,

Mark Lamb, always relevant to this action was elected Sheriff of Pinal

County in 2017.  Sheriff Lamb is responsible for operating the Pinal County

Sheriff's Department and Pinal County Detention Center. Sheriff Lamb  and

is sued in his official and individual capacities.  Sheriff Lamb is responsible

for the Pinal County Sheriff Department and the Pinal County Detention Center which denies effective communication to the deaf.

**4.** Always relevant hereto this action, Defendant, the State of Arizona operated , Arizona Department of Child Safety "DCS" a social and human services agency whose mission is to successfully engage children and families to ensure safety and strengthen families. DCS advertises that it offers language assistance services free of charge yet denied language assistance services to Plaintiffs.

5. Plaintiffs' claims herein arises from 42 U.S.C. § 12132 et seq., 29 U.S.C. § 791 and 42 U.S.C. § 1983 and therefore this Court has original subject matter jurisdiction pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1343(a)(3 &4).

6. All events alleged herein occurred within Pinal County, Arizona and therefore this Court (Phoenix Division) is the correct an appropriate venue for this action pursuant to 28 U.S.C. 1391(b)(1 & 2).

7. This Court (Phoenix Division) is the appropriate venue for this action pursuant to 28 U.S.C. 1391(b)(2).

/ / /

/ / /

/ /

## STATEMENT OF FACTS AS TO SHERIFF MARK LAMB'S ARREST OF THE JACKSONS

## MRS. JACKSON'S ACCOUNT OF THE NIGHT OF HER HUSBAND'S ARREST

**1.**      On May 14, 2021, Plaintiffs' adult son, Dashiel Jackson, called Pinal County Sheriff  911 to report, Sean Jackson, his father, for child abuse. Dashiel observed a handprint on his 4-year-old brother, Kaiden's, back and believed his father had  abused his brother.

2.      The 911 operator informed Dashiel that the Sheriff officers would be dispatched to his parents' home.  During the 911 call, Dashiel unequivocally informed the operator that his parents are deaf and that they would require a sign language interpreter to communicate with them, but the Defendants did not arrive to investigate with an ASL interpreter.

3.      On May 14, 2021, Mrs. Jackson was cleaning her home with her kids in bed.  It was Mrs. Jackson's routine to put the children to bed, clean house and wait for Mr. Jackson to come home from work at 11 p.m.

**4.**      On this evening, Mrs. Jackson received a text message from Dashiel notifying her that the police were on the way to her  home.  Dashiel did not explain that he had called the police on his father or offer any explanations at all.  The only thing known to Mrs. Jackson was that the police were coming to her home.

**5.**      Just after getting the text, Mrs. Jackson saw a light coming through her front window. She went to check out the light and saw three Sheriff's officers at her door that she believed had been standing there for some time knocking.

**6.**      Mrs. Jackson opened the door and used gestures to inform them of her deafness.  The officers did not attempt to explain anything and left leaving the door open.  Mrs. Jackson closed the door to prevent more bugs from coming inside her home and went back in her home.

**7.**      Mrs. Jackson looked out her window again to see why the officers were standing at her front door again. She wondered whether the officers needed to speak with her. One of the officers  pushed the front door open to demand that Mrs. Jackson leave the door open.  No officer attempted to explain anything to Mrs. Jackson, and she wondered why the police were at her home.

**8.**      Mrs. Jackson continue to clean up from earlier that day.  An officer then entered her home and followed Mrs. Jackson around as she went upstairs to check on her children.  Two of her children were awake and she informed the children that the police were there and not to be afraid.  Then the officer pointed to the living room and gestured for Mrs. Jackson to sit in the living room.

**9.**      As Mrs. Jackson sat down in the living room, her youngest child came from upstairs and joined her in the living room and sat beside her, frightened.  Two more law enforcement came into the Jackson home.

**10.**      As more and more officers came into the home, Mrs. Jackson's older four children came downstairs to sit beside her. All were frightened. Mrs. Jackson had no idea what was going on and therefore was unable to effectively console her children.

**11.**      Detective Brandi Jackson was among law enforcement at the Jackson home.  Mrs. Jackson believed that  Detective Jackson told  the children to go back upstairs as the children left the living room.

**12.**      Mrs. Jackson saw two other women who never attempted to identify themselves, came in her house and went upstairs. Mrs. Jackson believed that they spoke to her children and took pictures of her home.

**13.**      The women  gave Mrs. Jackson papers to sign without explanation. Mrs. Jackson asked for an ASL interpreter and was denied.  Unsure of what the papers meant; Mrs. Jackson signed the papers to  later learn that the papers were consent forms for  the State of Arizona's DCS to take temporary custody of her children.  Detective Jackson gestured that Mrs. Jackson's children were leaving but did not indicate  whether Mrs. Jackson was going with the children. No one  even attempted  to explain to Mrs. Jackson  the

reason why the group was at her home. Detective Jackson told Mrs. Jackson to wake and dress her youngest child.

14.     Two of her children were taken away in a white unmarked car. Two of her other children were taken in an unmarked van.  Mrs. Jackson was terrified, not knowing whether people at her home were impersonating police officers and kidnapping her children.

15.     After the children and police officers left, Detective Jackson made gestures to inform Mrs. Jackson that her husband had been arrested and was gone. Detective Jackson then tried to vocally communicate with Mrs. Jackson which was ineffective and awkward.

16.     Detective Jackson would quickly ask Mrs. Jackson a question leaving Mrs. Jackson guessing about what Detective Jackson was saying.  The two could not understand each other. Mrs. Jackson repeatedly asked for an interpreter but was denied.

17.     The two older  Jackson  children, Dashiel  and Tyler Jackson were two minutes away tried to get law enforcement to ensure interpreters were there for their parents or  let them interpret for Mrs. Jackson.   When Dashiel arrived, he asked an officer there were interpreters. The officer lied to Dashiel telling him interpreters were present.  Defendant Pinal County had the duty and opportunity to secure an interpreter for Mrs. Jackson but

refused to provide an interpreter and maliciously lied to Dashiel and Tyler Jackson so they could violate Mrs. Jackson's constitutional rights.

18. Also on May 14, 2021, Mrs. Jackson's friend Audrey drove to the police substation to try to pick up the Jackson children. Audrey kept asking the officers whether the Jacksons had interpreters. No would answer Audrey's inquiries.

19. As a result of Pinal County Sheriff Department's discrimination, Mr. Jackson was stuck in a hot car and could not tell them to open a window or turn on an air conditioner. Mr. Jackson resorted to screaming and pantomiming a dog and stuck out his tongue.

20. As a result of Defendants lack of effective communication with Mrs. Jackson, Mrs. Jackson did not understand why her husband was being arrested nor where her children were being take and the reasons why her children were being taken. Mrs. Jackson stayed at her residence alone and completely traumatized.

## MR. JACKSON'S ACCOUNT OF HIS ARREST

21. Mr. Sean Jackson left work in Mesa, Arizona at 10:30 p.m. and headed home. As he pulled into his garage, Mr. Jackson saw a sheriff's officer who greeted him. Mr. Jackson gestured to the officer that he would be there in a minute and finished parking his car.

**22.** Mr. Jackson took his cell phone of his phone holder, exited his car whereupon he observed three sheriff's officers in total. Mr. Jackson informed the officers that he is deaf.  One of the officers took Mr. Jackson's phone, car keys  and wallet and placed them in a paper bag and placed them on the hood of his car. Mr. Jackson gestured that  he needed an interpreter.

**23.** The officer ignored Mr. Jackson's request and started writing on notepad that he received a call regarding that Mr. Jackson hit Mr. Jackson's  son, Kaiden.

**24.** Mr. Jackson started writing back and forth about what happened with Kaiden. Mr. Jackson did not believe that the officers understood him.  The officer told Mr. Jackson to turn around and cuffed Mr. Jackson. Mr. Jackson asked the officer to handcuff him from the front so he could use his hands to communicate but the officer  would not do so.

**25.** The officers failed to accommodate Mr. Jackson's disability by providing an interpreter and handcuffing Mr. Jackson from behind to prevent Mr. Jackson from  fully understanding the legal process.

**26.** The officers walked Mr. Jackson to a squad car.  The officer handcuffed Mr. Jackson too tightly and caused Mr. Jackson pain.  As

Mr. Jackson entered the vehicle Mr. Jackson tried to explain that his handcuffs were too tight. The officer then loosened the handcuffs and left Mr. Jackson in a hot car with no ventilation.

27.     Mr. Jackson had trouble breathing and felt as if he were going to suffocate.  Mr. Jackson screamed as loud as he could.  After screaming for 5 to 10 minutes, an officer came to him.  Mr. Jackson pantomimed panting like a dog in an attempt to get the officer to open a window. The officer cracked the window two to three  inches and left.

28.     Mr. Jackson continued to pant and sweat and tried screaming as loud as he could again. The officer walked back to the squad car and turned the car's air conditioning on low. Mr. Jackson sat in the car for four  to five  hours when he was transported to police substation.

29.     As a result of Defendants Pinal County's lack of communication with Mr. Jackson during his first arrest, Mr. Jackson suffered the indignity of almost suffocating  in a hot police patrol vehicle, was compelled to frantically scream for help without knowing whether he was heard  and suffered dehydration. Mr. Jackson suffered this additional indignity because Defendants' failure to accommodate his disability by providing an ASL interpreter.  Mr. Jackson also did not know that the State of Arizona's  DCS had arrived at his residence and

had taken his children into State of Arizona DCS custody because of ineffective communication.

30.     Once at the substation, the officers placed Mr. Jackson in a small jail cell where he waited until he was called in for interrogation. Detective Brandi Jackson introduced herself by  writing on a note pad. Detective Jackson wrote the words Miranda rights on top of the paper. She continued to write asking Mr. Jackson if he could read English. Mr. Jackson responded that he could read English.

31.     Mr. Jackson wrote on the notepad that he wanted an interpreter. Detective Jackson informed Mr. Jackson that she could not get Mr. Jackson an interpreter until after his signed the Miranda Rights paperwork. Mr. Jackson requested an interpreter and again and Detective Jackson became aggressive, slamming her fingertips hard on the paper, demanding that Mr. Jackson sign it. Mr. Jackson then signed the paperwork not understanding what it meant.

32.     As a result of Defendant Pinal County denying Mr. Jackson an interpreter, Mr. Jackson was compelled to sign a Miranda waiver without understanding its meaning.

33.     After Mr. Jackson signed, Detective  Jackson started calling for an interpreter. Mr. Jackson waited for about thirty  minutes when

Detective Jackson informed him that she could not arrange for an interpreter and began interrogating Mr. Jackson in writing anyway.

**34.**     Detective Jackson asked Mr. Jackson what happened with his son,  Kaiden Jackson. Mr. Jackson tried to explain what happened that led to Kaiden's discipline.  Detective Jackson left the interrogation room and Mr. Jackson waited for an hour.

**35.**     As a result of the lack of communication between Mr. Jackson and Detective Jackson, Detective Jackson was able to coerce Mr. Jackson into signing a Miranda waiver to  secure statements from Mr. Jackson. Had Detective Jackson  not coerced Mr. Jackson  into signing Miranda waiver as the only avenue for Mr. Jackson to  get an interpreter, then Mr. Jackson's statements could not have been used against his wife.  The used of Mr. Jackson's statements against Mrs. Jackson adversely impacted their marital relationship.

**36.**     Another officer came in and told Mr. Jackson to go with him. The officer had the bag with Mr. Jackson's car keys, wallet  and cell phone. The officer drove off with Mr. Jackson.

**37.**     The officer then instructed Mr. Jackson to get out to the car and placed Mr. Jackson in a different squad car without bringing Mr. Jackson's bag with his car keys, wallet  and cell phone. Mr. Jackson

tried to inform them that they left his bag, but the officers ignored Mr. Jackson.

**38.**     The officer then took  Mr. Jackson's mugshot and placed him in a cell for two days until his initial court hearing.

## STATEMENT OF FACTS AS TO
## MRS.  JACKSON'S  SUBSEQUENT ARREST AND INCARCERATION

39.     On May 26, 2021, Mrs. Jackson was at home when she saw six to seven police officers through her front window. Mrs. Jackson was puzzled and trying to figure out why police officers were at her home again.

**40.**     Mrs. Jackson saw Detective Jackson gesturing with her finger to "Come here."  Mrs. Jackson who was barefooted walked toward Detective Jackson. Detective Jackson grabbed Mrs. Jackson, placed Mrs. Jackson's hands behind her and handcuffed Mrs. Jackson leaving her standing on landscaping gravel in Mrs. Jackson's yard.

**41.**     All of the officers then went inside the Jackson home.  Later one officer came out to Mrs. Jackson and moved her to the black concrete facing one of the Sheriff trucks. Mrs. Jackson stood there for fifteen minutes vocally trying to inform the officers that her bare feet were burning on the concrete and that she did not have her glasses. One of the officers then moved Mrs. Jackson to the backseat of one of the officers' SUV.

**42.**     Mrs. Jackson sat in the SUV hands and wrists hurting from the

handcuffs being too tightly placed.  Mrs. Jackson tried to say, "It hurts. It

hurts."  The officer then moved Mrs. Jackson's handcuffs to the front of her

body. Mrs. Jackson gestured that she needed her hearing aids, glasses, and

shoes.  Mrs. Jackson could not see or understand any officers from a

distance. The officer gestured "Wait."

**43.**     After two hours the officers brought Mrs. Jackson her hearing aids,

glasses, and shoes. The officers took Mrs. Jackson to a small police station

where she sat for hours until Detective Jackson took her to Florence Adult

Detention.  Mrs. Jackson had no idea why she had been arrested and taken

to jail. As a result of Defendants' ineffective communication, Mrs. Jackson

did not understand why she had been arrested.

**44.**     Mrs. Jackson had been requesting interpreters ever since the officers

came to her home. The officers did not provide Mrs. Jackson with an

interpreter and made no attempt to do so while having duty and opportunity

to get an  interpreter.

**45.**     On May 27, 2021, an officer took Mrs. Jackson to a small courtroom.

Mrs. Jackson requested of the jail officer an interpreter for the proceedings.

As Mrs. Jackson stood before the judge, she vocalized and gestured that she

needed an interpreter.  Mrs. Jackson assumed that the judge said, "Read my lips" but Mrs. Jackson was unable to do so because of her farsightedness.

46.     The bailiff gave Mrs. Jackson a document that she did not understand concerning bail. Not understanding how to bail out, the officers took Mrs. Jackson back to the detention center where she stayed until her next court hearing on June 4, 2021.

47.     On June 4, 2021, Mrs. Jackson's court hearing was cancelled.  On June 14, 2021, Mrs. Jackson was taken to court in filthy clothes that she had been in since May 26, 2021. Mrs. Jackson did not know how to get clean clothes.

48.     This time the Court provided Mrs. Jackson with an interpreter and Jim Soslowsky was appointed as her lawyer and she was taken back to jail.

49.     Mrs. Jackson stayed at the detention center from May 26, 2021, to July 11, 2021. There she had no toilet paper, no trash can, no rule book, no extra clothing or other necessities as provided to  other detainees.

50.     One of the detainees informed Mrs. Jackson that one of the detention officers wiped the word deaf off of the slot area of her cell that was supposed to be there to alert the other detention officers of her disability.

51.     Mrs. Jackson learned that she had to purchase soap  but had no idea how to make the purchase. She learned that someone had to put money on

her "books." No one would assist Mrs. Jackson to call family or friends so she could ask them to put money on her "books."

52.     The detention officers mistreated Mrs. Jackson. She was only allowed two small meals a day. Mrs. Jackson tried to save food which she later learned was against the rules. Mrs. Jackson was being forgotten.  She became dizzy and severely dehydrated.  She was never told to save her cup so that she could get water. She learned that the only way she could get toilet paper was to save her cardboard roll insert for toilet paper.

53.     Mrs. Jackson began heavily menstruating. She was not given any pads and had to use the only towel she had. This towel was used for wiping herself after going to the bathroom, drying off after a shower and for her period. As a result, Mrs. Jackson developed an infection around her pubic hairline from  wearing the same unclean underwear. The detention officers never took Mrs. Jackson for a shower but before her court hearing.

54.     Mrs. Jackson tried to request medical treatment for her growing infection but did not understand that she had to fill out a form for each visit. Mrs. Jackson spent much of her time sobbing because of her cruel, inhumane treatment.

55.     When Mrs. Jackson finally saw a nurse on July 11, 2021, the nurse informed Mrs. Jackson that Mrs. Jackson should have been permitted to

leave her cell three times per week for exercise. After Mrs. Jackson learned of the protocol, she was only permitted to leave her cell two times per week.

**56.**     During her jail stay, Mrs. Jackson was only able to see the nurse one time and only received one change of clothes given to her by the nurse. The guards did give Mrs. Jackson new socks with the old ones  she had no choice but to use as menstrual pads.

**57.**     As a result of the lack of effective communication during Mrs. Jackson's jail stay, Mrs. Jackson was subjected to inhuman conditions that caused her to develop PTSD.

**58.**     Since being released for jail, Mrs. Jackson was/is  compelled to seek treatment for Defendants' injury that caused  her to sustain  PTSD.

### <u>STATEMENT OF FACTS AS TO SHERIFF MARK LAMB<br>MR.  JACKSON'S  INCARCERATION</u>

**59.**     Mr. Jackson remained in jail for two days when he was taken to a courtroom.  Mr. Jackson remained there dazed and  looking around until he realized a judge was talking to him. Mr. Jackson gestured he was deaf, and a bailiff handed him a paper about bail.   An officer took Mr. Jackson back to jail where he was assigned a cell with a cellmate.

**60.**     The detention officers made no effort to explain the rules of his detention to Mr. Jackson.  Mr. Jackson's cellmate called his cellmate's  aunt to send  Mrs. Jackson a message to Mr. Jackson's father. The cellmate

informed Mr. Jackson that Mr. Jackson's father was working  on  bailing

him out of jail.

**61.**     One week later, a guard came and told Mr. Jackson that Mr. Jackson

would be released at 1 p.m.  Mr. Jackson's father had bailed him out. Mr.

Jackson signed release paperwork and was taken to a sheriff's vehicle for

release. About three minutes into the ride, the sheriff's officer wrote on a

piece of paper change of plans and took Mr. Jackson to a police station to re-

arrest him.

**62.**     When they arrived at the police station, two other officers approached

them.  Mr. Jackson was puzzled and confused.   One officer told Mr.

Jackson to follow him and placed him in a cell.

**63.**     Detective Jackson then arrived with a smirk on her face and shook her

head, "no." Mr. Jackson gestured what happened.   Detective Jackson wrote

you came out on  bail but now you have six charges of assault weapons.  Mr.

Jackson wrote on a paper, "Can you explain what assaults weapons is?"

**64.**     Detective Jackson looked at Mr. Jackson and said nothing.  Mr.

Jackson requested an interpreter. Detective Jackson motioned wait with her

fingers. Mr. Jackson receive no interpreter and was taken back to the

detention center where he was rebooked.

**65.** As a result of ineffective communication with Detective Jackson, Mr. Jackson did not understand the six new charges against him and did not understand  that his wife was under investigation and would be arrested.

**66.**     They placed Mr. Jackson in a cell by himself then moved him to a cell with a cellmate where Mr. Jackson stayed for two weeks.  The cellmate assisted Mr. Jackson with everything at the detention center telling him when there were meals and showers.

**67.**     As result of Defendants ineffective communication with Mr. Jackson, did not understand why he was abruptly being returned to jail with new charges.  Mr. Jackson was unable to contact his employer to inform the employer of his absence from work.  Consequently, Mr. Jackson lost his job.

**68.**     During his incarceration, no one explained  the jail policy that Mr. Jackson could set up legal calls with an attorney.  Mr. Jackson did not learn that his wife had been arrested and charged until May 28, 2021 by way of a friend of Mrs. Jackson.   No one explained the jail's  policy of email and texts for communication.  Consequently, Mr. Jackson was more isolated than the other inmates and suffered more  indignities because of his disability.

**69.**     On July 11, 2021, Mr. Jackson's grandmother raised bail again and Mr. Jackson was released.  Mr. Jackson saw Mrs. Jackson in a waiting room also waiting to be released from jail.  Mr. and Mrs. Jackson relieved to see

one another, walked to a nearby McDonald's and asked employees for help to make a phone call. After two hours of trying to get a ride, the Jackson's finally got a ride home.

/ / /
/ / /
/ / /

## STATEMENT OF FACTS AS TO STATE OF ARIZONA

**70.**    Plaintiffs incorporate by this reference each allegation previously made in this Complaint, as if fully set forth herein.

**71.**    On May 17, 2021, Mrs. Jackson called the State of Arizona's DCS to inquire about what she could do to get her children back. Mrs. Jackson spoke with Lisa Ueling who made an appointment for the two of them to meet in person on May 18, 2021, with a sign language interpreter.

**72.**    On May 18, 2021, Mrs. Jackson arrived at the agreed DCS location to meet with Ms. Ueling, whom Mrs. Jackson learned was her caseworker. Ms. Ueling's supervisor, Michelle, also attended the meeting. Ms. Ueling gestured with her hands to inform Mrs. Jackson that the meeting was cancelled.

**73.**    Mrs. Jackson gestured back as if cutting her neck with her hands to indicate that the meeting was cancelled. Then Ms. Ueling gestured "wait"

with her fingers and wrote "Attorney John Schaus" with a phone number next to his name on a small piece of paper. Mrs. Jackson did not understand why she was to call Attorney Schaus but went home, deciding that she would figure it out later.

74.     Mrs. Jackson called Attorney Schaus four times throughout the day via video relay service and left a message each time she called.  Mrs. Jackson received no call back.

75.     On May 21, 2021, at around 2 p.m., a friend of Mrs. Jackson called her to inform her that she had a court hearing that moment because Mrs. Jackson's son,  Dashiel,  told her.  Mrs. Jackson immediately called Sorenson Video Relay Service and provided the interpreter with the phone number and identification number to the conference.

76.     John Schaus, who Mrs. Jackson learned was her attorney spoke with her. He asked Mrs. Jackson if she could be to court in fifteen minutes.  Mrs. Jackson informed him that it would take 30 minutes for her to make it to court.

77.     The court hearing was then held telephonically and discussed the case. The next hearing was set for June 4, 2021.

78.     In the on-going months, the State of Arizona through its DCS workers discriminated against the Jackson by questioning their abilities to monitor

their children because the Jacksons are deaf.  The workers spoke down to the Jacksons questioning the Jackson's intelligence to care for their children when they conducted family team meetings. The Jacksons endured the discriminatory treatment that took a toll of both Jackson's self-esteem.

**79.**     On August 1, 2022, the State of Arizona through DCS workers held a family team meeting for the Jacksons  without an ASL interpreter available in violation of  the State of Arizona's DCS policy.  The Jackson's case worker placed the burden on the Jacksons to arrange for their own interpreter.  Mrs. Jackson objected, and the family team meeting had to be rescheduled.

**80.**     On  August 22, 2022, the State of Arizona through its DCS workers attempted to hold a family team meeting for the Jackson's son, Kasean without an ASL interpreter. The Jacksons objected and the family team meeting had to be rescheduled.

**81.**     As a result of ineffective communication, The Jackson's reunification with their children was delayed because of  the State of Arizona through DCS's failure to secure ASL interpreters and on three  occasions meetings were cancelled.

**82.** As a result of  the State of Arizona through DCS's failure to communicate with Mrs. Jackson she did not understand that they were taking her children

into  State of Arizona DCS custody the night of her husband's arrest and the

reasons why until many days later, when an interpreter was  finally assigned

to Mrs. Jackson.

### COUNT ONE VIOLATION OF Title II of the Americans with Disabilities Act "ADA", 42 U.S.C. § 12132 et seq. both Plaintiffs as to all Defendants

**83.**     Plaintiffs incorporate by this reference each allegation previously

made in this Complaint, as if fully set forth herein.

**84.**     At all times relevant to this action, Title II of the ADA was in full

force and effect and applied to Defendants' conduct.

**85.**     Title II of the ADA provides that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation

in or be denied the benefits of the services, programs or activities of a

public entity or be subject to discrimination by such entity" which was in in

full force and effect and applied to Defendants' conduct as alleged above.

**86.**     At all times relevant to this action, Plaintiffs were qualified

individuals having disabilities within the meaning of ADA Title II because

they suffer impairments that limit the major life activity of hearing and

such limitations are substantial.

-26-

**87.** Defendants offered services, programs, and activities by virtue of the State of Arizona operating DCS and Pinal County and Sheriff Mark Lamb running a sheriff's department and the Pinal County Jail.

**88.** Plaintiffs were denied these services and were discriminated against by Defendants' failure to ensure effective communication through the provision of qualified in-person interpreters. As a result, Mr. and Mrs. Jackson did not understand the reasons why DCS took their children and were denied the opportunity to fully understand the legal procedures against them. Additionally, Mrs. Jackson signed a consent for her children to be taken by DCS without understanding what granting the consent meant and the Jackson's reunification with their children was delayed.

**89.** Defendants Pinal County and Sheriff Mark Lamb denied services to Plaintiffs by prosecution and incarceration in their programs and services they offered to Plaintiff without such programs and services being explained to Jackson through qualified ASL interpreters.

**90.**     As set out above, absent injunctive relief there is a clear risk that the Defendants' actions will recur with Plaintiffs and/or additional deaf persons.

**91.**     Plaintiffs are therefore entitled to injunctive relief, as well as an

award of attorney's fees, costs, and disbursements, pursuant to 42 U.S.C. §

12205.

## COUNT TWO VIOLATION OF Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 both Plaintiffs as to all Defendants

**92.**     Plaintiff incorporates by this reference each allegation previously

made in this Complaint, as if fully set forth herein.

93.     At all times relevant to this action, Section 504 of the Rehabilitation

Act, 29 U.S.C. § 794, was in full force and effect and applied to Defendants'

conduct.

**94.**     At all times relevant to this action, the United States Department of

Health and Human Services ("HHS") regulations implementing Section 504

of the Rehabilitation Act, 45 C.F.R. § 84.3(j), and they are therefore

individuals with a disability as defined under 29 U.S.C. § 708(20)(B).

**95.**     Pursuant to Section 504, "No otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial

assistance . . ." 29 U.S.C. § 794.

**96.** Defendants further discriminated against the Plaintiffs by failing to ensure effective communication through the provision of qualified in person interpreters.

**97.** As set out above, absent injunctive relief there is a clear risk that Defendants actions will recur again with the Plaintiffs and other deaf citizens.

**98.** Plaintiffs are therefore entitled to seek and recover compensatory damages for the injuries and loss they sustained as a result of the Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged.

**99.** Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## COUNT THREE VIOLATION OF 42 U.S.C. § 1983 Claim for Unsanitary Conditions of Confinement by Mrs. Jackson against Pinal County and Sheriff Mark Lamb only

**100.** Plaintiff Mrs. Jackson  incorporates by this reference each allegation previously made in this Complaint, as if fully set forth herein.

**101.** The conditions of Mrs. Jackson's confinement  amount to punishment in violation of the Due Process Clause.

**102.**    Pinal County and Sheriff Mark Lamb were deliberately indifferent to Mrs. Jackson's right to sanitary conditions and effective communication during her jail stay.

**103.**    As result of Pinal County and Sheriff Mark Lambs deliberate indifference to Mrs. Jackson's constitutional rights, Mrs. Jackson was made to endure unsafe and unsanitary conditions while incarcerated.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all his claims, pursuant to the U.S. Constitution Seventh Amendment and Federal Rules of Civil Procedure Rule 38 (a,b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, reserves the right to amend this Complaint at the time of trial to include all items of damages not yet ascertained, prays judgment against the Defendants, and each of them, as follows:

1.    An order awarding Plaintiff actual and compensatory damages for violations of civil rights, disability discrimination  and restitution in an amount according to proof a time of trial;

2.    An order awarding Plaintiff actual and compensatory damages in compensation for  disability discrimination;

3.    An order awarding Plaintiff's reasonable attorney's fees and costs;

4.      An order awarding Plaintiff prejudgment interest according to proof; and

5.      For such other and further relief as the Court deems just and proper.

DATED this  November 29, 2022.

By: /s/ Elizabeth D. Tate

_____

*Attorney for Plaintiffs*